**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| ANDREA BAXLEY | : | |
| Plaintiff, | : | Case No. 3:07CV0166 |
| vs. | : | District Judge Thomas M. Rose |
| MICHAEL J. ASTRUE, Commissioner of the Social Security Administration, | : | Magistrate Judge Sharon L. Ovington |
| | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATIONS[1]**

**I.    INTRODUCTION**

On July 22, 2002, Plaintiff Andrea Baxley filed an application for Supplemental Security Income (SSI) with the Social Security Administration. (Tr. 62-64). She claimed through her application that she was eligible to receive SSI because beginning on October 10, 1995, she was under a "disability" within the meaning of the Social Security Act due to seizures, depression, panic and anxiety attacks, and two cracked vertebrae. (Tr. 62, 81).

After various administrative proceedings, Administrative Law Judge (ALJ) Melvin A. Padilla denied Plaintiff's SSI application based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Act. (Tr. 30). The ALJ's nondisability determination and the resulting denial of her SSI application later became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. §405(g), which Plaintiff is now due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #12), the administrative record, and the record as a whole.

Plaintiff seeks a remand of this case to the Social Security Administration to correct certain errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II. FACTUAL BACKGROUND

### A. Plaintiff And Her Testimony

At the time of the ALJ's decision, Plaintiff's age (44) placed her in the category of a "younger person" for the purpose of resolving her SSI application. *See* 20 C.F.R. §416.963 (c); s*ee also* Doc. 9 at 2. Plaintiff earned a high school equivalent diploma. From 1987 through 1993 she worked various, mostly short-term jobs. (Tr. 82). Her longest employment involved milking and herding cows. (Tr. 82).

Plaintiff testified during the ALJ's hearing that she last worked in 1996 for 3 or 4 months as a banquet server. (Tr. 570). She was incarcerated from 1996 to July 2002 relating to drug and alcohol abuse. (Tr. 588). She has not engaged in substantial gainful employment since her release from incarceration in 2002. *See* Tr. 32, 82, 571.

Previously, in 1991, she lost custody of her children to her ex-husband. (Tr. 570-71, 588).

Plaintiff testified she cannot work because of "mental problems." (Tr. 571). She describes her symptoms as getting "real anxious and real nervous...." *Id*. This happens when she is around people, which causes her to "get really upset..." *Id*. She explained, "I just – I don't deal – I get real nervous around people and when I'm talking to people...." (Tr. 572). She does not have an appetite, and she takes medication to help her sleep and additional medications for daily headaches and occasional seizures, which she described as "pseudoseizures." (Tr. 572, 577-78, 590). She denied experiencing side effects from her medications. (Tr. 578). Plaintiff further testified that she sees a counselor, Mike McVey, twice a month and a nurse practitioner once a month for medication management. (Tr. 573-74). She no longer drinks alcohol and has not used cocaine since 1994. (Tr. 578–79, 581).

Plaintiffs's medication helps with her seizures. She explained, "It's a stress disorder and it's caused from anxiety and stress." (Tr. 590). She testified that she has more seizures when she is nervous. *Id*. Plaintiff further testified that she cries a lot, "[a]nd when I cry, it makes me angry and I try not to cry because when I get angry, I just – I have a tendency to blackout and it just – I don't – it just makes me mad, because I don't like people to see me cry." (Tr. 590-91).

3

Plaintiff also suffers from two bulging discs in her thoracic spine.[2] (Tr. 576).

Plaintiff has a driver's license and drives 3 or 4 times a week. (Tr. 569). Her daily activities included cooking, washing dishes, laundry, shopping with her mother, occasionally going out with friends, attending church, listening to music, going to the park, doing puzzles (when she can concentrate), and taking care of eight cats with help from a friend. (Tr. 583-85, 587). She also likes to go to the park and be outside. (Tr. 585). She visited her sister in Mississippi for two weeks in 2002. (Tr. 585-86). She also visits her mother, goes to doctor appointments, visits friends, or sits on her porch and watches the chickens and roosters who belong to her neighbor. (Tr. 571, 586-87).

**B.** **Medical Source Opinions**

Plaintiff acknowledges, "There is no treating *physician* to whose opinion controlling weight must be given." (Doc. #9 at 7)(Plaintiff's emphasis). She thus relies in part on the opinions of her treating psychiatric nurse, Bobbie Fussichien, MSN, RNCS. *Id*. at 7-11. In April 2004 Ms. Fussichien completed a form thus providing her opinions about Plaintiff's mental work abilities. The form presented four categories for rating Plaintiff's work abilities: unlimited/very good, good, fair, or poor/none. (Tr. 449). Ms. Fussichien checked lines indicating that Plaintiff had a fair ability – meaning, a her ability was "seriously limited, but not precluded" – to function in nearly all the mental work-

---

[2] Plaintiff focuses her contentions on her mental work limitations rather than her physical work limitations (Doc. #9 at 3, n.1), and consequently, a detailed description of her physical impairments is unwarranted.

4

related activities including, for example, her abilities to follow work rules, relate to coworkers, deal with the public, use judgment, maintain personal appearance, behave in an emotionally stable manner, and demonstrate reliability. (Tr. 449. 451). Ms. Fussichien also thought Plaintiff possessed a fair ability to understand, remember, and carry out simple and detailed – but not complex – job instructions. (Tr. 450). Ms. Fussichien further believed that Plaintiff had no ability to maintain attention or concentration and no ability to understand, remember, and carry out complex job instructions. (Tr. 449-50). Ms. Fussichien noted in support of her opinions that Plaintiff had decreased concentration and was irritable or agitated at times. (Tr. 450).

The administrative record contains notes written by Ms. Fussichien documenting that Plaintiff began seeing her in August 2002. (Tr. 338-42). At that time, she diagnosed Plaintiff as suffering from major depression, recurrent, and a possible (rule out) bipolar disorder. (Tr. 342). She assessed Plaintiff's GAF at 50, generally indicating a person with "serious symptoms ... or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...."[3] <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th ed., Text Revision at p. 34 ("DSM-IV-TR"). Ms. Fussichien placed Plaintiff on Effexor XR. (Tr. 343).

Plaintiff acknowledges that she saw Ms. Fussichien "for medication management."

---

[3] "GAF," or Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* DSM-IV-TR at 32-34.

(Doc. #9 at 4).  She explains that her medication had to be adjusted multiple times over the course of treatment and that "the records show [she] saw Ms. Fussichien about once a month since August, 2002." *Id.* (citing Tr. 342-43, 419-36, 502-06).  During that period of time, Ms. Fussichien typically noted depressed moods.  (Tr. 419-36).  She further noted either appropriate or blunted affect, and fair concentration and memory. (Tr. 424-25, 428-29, 431-34, 436).  Plaintiff did not report any side-effects from the medications (Tr. 436) and reported doing "ok" on medications.  (Tr. 434).

Plaintiff also relies on her treating mental health counselor, Mike McVey, who holds an MA in rehabilitation counseling, an LPCC (licenced professional clinical counselor), and LICDC (licensed independent chemical dependency counselor).  (Tr. 507).  In September 2004, Mr. McVey answered written interrogatories by checking lines indicating his opinion that Plaintiff could not perform 16 of 16 mental work-related activities.  (Tr. 507-09).  Mr. McVey supported his opinions by referring to another form.  (Tr. 507).

Mr. McVey also completed a form in September 2004 indicating his opinion that Plaintiff had poor or no ability to deal with the public, interact with supervisors, deal with work stresses, and maintain attention/concentration.  (Tr. 511).  He explained that Plaintiff was only able to briefly manage her mood, affect, and cognition in interpersonal settings for less than 30-minute periods.  (Tr. 512).  He further opined that Plaintiff had no ability to understand, remember, and carry out either simple, detailed, or complex job instructions, because her "depressive symptom interfere with her ability to attend, track &

comprehend instructions...." *Id*. And for the same reasons given in support of his other opinions, Mr. McVey concluded that Plaintiff could not behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (Tr. 513).

The record also contains the opinions of psychologist Dr. Schulz, who evaluated Plaintiff on two occasions for the Ohio Bureau of Disability Determination. (Tr. 260-67, 530-540). In November 2002 Plaintiff informed Dr. Schulz that she had been in treatment for social phobia and depression since her release from prison. Dr. Schulz reported that upon mental status examination, Plaintiff's speech was clear and understandable, her affect was appropriate and congruent, and her mood was normal ("euthymic"). (Tr. 263). Plaintiff denied any suicidal or homicidal ideations, and she reported being nervous around crowds and in enclosed places. (Tr. 263). Testing revealed that Plaintiff was able to count backwards from 100 to 80 by 4s with 1 error, could count backwards by serial 2s from 50 down to 30 with no errors, could carry out a 3-step task, and could recall 2 out of 3 objects after 5 minutes. (Tr. 263).

Dr. Schulz diagnosed depressive disorder, not otherwise specified, social phobia, alcohol abuse in remission, and borderline intellectual functioning. (Tr. 264-65). He assessed her GAF at 60 (Tr. 265), generally indicating a person with "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at p. 34. Dr. Schulz further opined:

1. Plaintiff's ability to relate to other people, including coworkers and supervisors, was minimally-to-mildly impaired;

7

      2.      Her ability to understand, remember and follow instructions was moderately impaired;

      3.      Her ability to comprehend and complete simple and moderate daily tasks was minimally impaired for tasks within the borderline range of intellectual functioning; and

      4.      Her ability to withstand stress and pressures of day-to-day work activity was mildly impaired by social anxiety and depressive features.

(Tr. 266).

Dr. Schulz's second evaluation, which occurred in December 2004, led him to diagnose Plaintiff with bipolar disorder, alcohol abuse in remission, borderline intellectual functioning, and borderline personality disorder. (Tr. 536). He assessed Plaintiff's GAF at 52. *Id*. Although this was lower than his prior GAF assessment of 60, it was within the lower range of the same GAF category ("moderate symptoms") in which he had previously assessed Plaintiff. DSM-IV-TR at p. 34. Dr. Schulz opined:

      1.      Plaintiff's ability to relate to other people was moderately impaired;

      2.      Her ability to understand, remember and follow instructions was moderately impaired;

      3.      Her ability to maintain attention and concentration to perform simple, repetitive tasks was moderately impaired for tasks within the borderline range of intellectual functioning; and

      4.      Her ability to withstand the stress and pressures associated with day-to-day work activity was moderately impaired..

(Tr. 537).

Dr. Schulz completed a form by checking boxes indicating his opinions noted that Plaintiff had fair ability to perform all of the mental work-related activities. He based his

8

opinion on the results of a test he had administered (MMPI – Minnesota Multiphasic Personality Inventory), and the mental status examinations he had performed. (Tr. 539-40).

### III. ADMINISTRATIVE REVIEW

#### A. The "Disability" Requirement And The Sequential Evaluation

The Social Security Administration provides Supplemental Security Income to indigent individuals, subject to several eligibility requirements. Chief among these, for purposes of this case, is the "disability" requirement. To receive SSI, an applicant must be a "disabled individual." 42 U.S.C. §1381a; *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986). The phrase "disabled individual" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment that is severe enough to prevent them from engaging in substantial gainful activity. 42 U.S.C. §1382c(a)(3)(A); *see Bowen*, 476 U.S. at 469-70. An SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992).

Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §416.920(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*,

475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential evaluation answers five questions:

> 1. Is the claimant engaged in substantial gainful activity?
>
> 2. Does the claimant suffer from one or more severe impairments?
>
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
>
> 4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
>
> 5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

### B. The ALJ's Decision

In the present case the ALJ found at Step 2 that Plaintiff had severe impairments of affective disorder with features of depression and anxiety, history of polysubstance abuse in reported remission, personality disorder, and possible borderline intellectual functioning. (Tr. 32).

The ALJ determined at Step 3 that the severity of these impairments does not meet or equal one in the Listings. *Id.*

At Step 4 the ALJ found that Plaintiff had the Residual Functional Capacity to

perform a reduced range of medium work.[4]  The ALJ described his specific findings as follows:

> The claimant can lift up to fifty pounds occasionally and twenty-five pounds frequently; she must avoid climbing ladders or scaffolds, working at unprotected heights or around hazardous machinery; she must have a clean-air, temperature-controlled environment; she is limited to low stress jobs (no dealing with the public, no production quotas, and no fast paced work); contact with supervisors and coworkers is limited to minimal; she must avoid extended periods of concentration; and jobs in contact with drugs or alcohol.

(Tr. 33).  The ALJ found that Plaintiff had worked in no past relevant jobs and that her "subjective complaints were not totally supported by the record." *Id*.

These conclusions, along with the ALJ's findings throughout his sequential evaluation, led him to ultimately conclude that Plaintiff was not under a disability and hence not eligible for SSI.  (Tr. 18-34).

**IV.    JUDICIAL REVIEW**

Judicial review of an ALJ's decision proceeds along two lines:  whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria." *Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

"Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part

---

[4] The Regulations define medium work as involving the ability to lift "no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds...." 20 C.F.R. §416.967(c).

11

*Richardson v. Perales*, 402 U.S. 389, 401 (1977)).  It consists of "'more than a scintilla of evidence but less than a preponderance...'"  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*.  *See Cutlip v. Secretary of Health and Human Servs.*, 25 F3d 284, 286 (6th Cir. 1994).  The required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings.  *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence."  *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *See Bowen*, 478 F3d at 746.  This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

**V.    DISCUSSION**

Plaintiff contends that the ALJ erred by not evaluating the opinions of Dr. Schulz.  Plaintiff emphasizes that his opinions were similar to Ms. Fussichien's opinions that

12

Plaintiff had only "fair" abilities in most areas of mental work functioning. Plaintiff argues maintains that the ALJ merely mentioned that Dr. Schulz assessed Plaintiff's GAF at 52 but failed to discuss the weight he was placing on Dr. Schulz's opinions as required by the Regulations and Social Security Ruling 96-6p.

Plaintiff also contends that the ALJ failed to weigh Ms. Fussichien's opinions under the factors required by the Regulations, 20 C.F.R. §416.927(d), as clarified by Social Security Ruling 06-03p. And she contends that Mr. McVey's opinions were similar to, if not more limited than, the limitations set by Ms. Fussichien.

A review of the ALJ's decision reveals a well-supported description of the medical source opinions and records. *See* Tr. 21-29. The ALJ then discussed the reasons why he did not credit the opinions of Ms. Fussichien and Mr. McVey. *See* Tr. 29. Contrary to Plaintiff's contentions, the ALJ provided sufficient information to show that he weighed these medical source opinions as the Regulations required.

At the time of the ALJ's decision in October 2005, the Regulations did not include nurse practitioners or counselors, within the list of acceptable medical sources but did include them within the list of "other [non-medical] sources." *Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 541 (6th Cir. 2007)(quoting 20 C.F.R. 404.1513 (1997)) (brackets in *Cruse*). As a result, the ALJ did not err as a matter of law by recognizing that nurse practitioner, Ms. Fussichien, and her counselor, Mr. McVey, were not considered acceptable medical sources under the Regulations. *See id.*; *see also* Tr. 28.

13

Under the then-applicable Regulations, "an ALJ ha[d] the discretion to determined the proper weight to accord opinions from 'other sources' such as nurse practitioners." *Cruse*, 502 F.3d at 541.  Although this permissive language did not require the ALJ to consider Ms. Fussichien's and Mr. McVey's opinions, the ALJ did so by considering whether their opinions were supported by therapy or counseling records.  *See* Tr. 28.  The ALJ rejected Ms. Fussichien and Mr. McVey's opinions as inconsistent with the November 2002 opinion of Dr. Schulz and opinion of a record-reviewer for the Ohio Bureau of Disability Determinations, Dr. Benninger.  (Tr. 28-29).  Given that the Regulations applicable at the time of the ALJ's October 2005 decision did not recognize nurse practitioners or counselors as acceptable medical sources, the ALJ did not err by weighing Ms. Fussichien and Mr. McVey's opinions in this manner.  *See Cruse*, 502 F.3d at 541-42.

Plaintiff argues otherwise based on Social Security Ruling 06-03p, which clarified the need for ALJs to weigh non-treating medical source opinions, including nurse practitioners or counselors, "by using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion with other evidence, and how well the medical source explains the opinion." *Cruse*, 502 F.3d at 541 (quoting Ruling 06-03p)(other citations omitted).  Plaintiff's reliance on Ruling 06-03p is misplaced because it did not become effective until August 9, 2006, *see Cruse*, 502 F.3d at 542, ten months after the ALJ's October 2005 decision.  Ruling 06-03p does not apply retroactively to the ALJ's

October 2005 decision. *Cruse*, 502 F.3d at 542 (citing *Landsgraf v. USI Film Products,* 511 U.S. 244, 275 n.29 (1994)).

Plaintiff also argues that the ALJ did not discuss the weight he gave to Dr. Schulz's opinions. In particular, Plaintiff contends that the ALJ never mentioned the detailed functional assessment form completed by Dr. Schulz. Contrary to Plaintiff's contention, the ALJ specifically discussed the functional assessment form completed by Dr. Schulz in December 2004. *See* Tr. 29. The ALJ stated that "Dr. Schulz completed a mental capacity assessment indicating essentially all 'fair' abilities to work, based on his second examination in December 2004 (with 'fair' defined as 'the individual can perform the activity satisfactorily some of the time')." (Tr. 29). And, contrary to Plaintiff's contention, the ALJ discussed several reasons for not giving any significant weight to Dr. Schulz's December 2004 opinion. *See* Tr. 29. Indeed, the ALJ recognized that, despite Dr. Schulz's opinion, Dr. Schulz noted that, during the mental status examination, Plaintiff "was cooperative but at times vague and somewhat evasive towards the examiner's questions." (Tr. 29). The ALJ further recognized Dr. Schulz's report that Plaintiff's MMPI-2 test results showed an invalid profile. (Tr. 29). Dr. Schulz's statements regarding Plaintiff's evasiveness in answering questions and her invalid MMPI-2 test results were significant in that Dr. Schulz based his opinion that Plaintiff had a "fair" ability to perform mental work-related activities specifically on Plaintiff's MMPI2 test results and clinical interview (Tr. 539-40). Because Dr. Schulz's December 2004 opinion was based on invalid test results and a questionable clinical interview, the

15

ALJ was not required to give any significant weight to that opinion.  In this manner, the ALJ evaluated Dr. Schulz's December 2004 opinion as required by the Regulations.

Accordingly, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's final non-disability determination be affirmed; and

2. The case be terminated on the docket of this Court.


August 19, 2008                                             s/ Sharon L. Ovington
                                                           Sharon L. Ovington
                                                           United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).